### SMITH v. OKLAHOMA CITY BLDG. & LOAN ASS'N et al.

No. 25780.   Feb. 18, 1936.

Rehearing Denied Dec. 22, 1936.

Application for Leave to File Second Petition for Rehearing Denied Jan. 19, 1937.

Shirk, Danner & Phelps and John Barry, for plaintiff in error.

Everest & Halley for defendant in error Oklahoma City Building & Loan Association.

M. B. Cope, for Bank Commissioner and Loan Board, appearing in the trial court, not appearing on appeal.

PER CURIAM. This action was instituted in the district court of Oklahoma county by D. M. Smith, plaintiff in error, as plaintiff against the Oklahoma City Building & Loan Association, a corporation. The parties will be referred to as plaintiff and defendant, as they appeared in the trial court.

The action was to recover on three causes of action. The third cause of action was dismissed by the plaintiff. The first cause of action was to recover the principal sum of $5,250, with dividends and interest representing 25 per cent. of the value of fully paid stock which the plaintiff owned in the defendant corporation. The second cause of action was to recover $395.81, consisting of $344.31 principal, representing 25 per cent. of the value of an installment certificate of Class E stock of the defendant corporation, with interest and accumulated dividends.

Smith set out in the petition that he had purchased these two classes of stock in the defendant corporation, and that on October 14, 1931, he made demand upon the corporation for the withdrawal of the funds invested in the stock of the loan company, as permitted by the statutes of Oklahoma and the by-laws of the loan company. He alleged that the loan company had on hand on July 26, 1933, sufficient funds with which to pay the full value of his stock of both classes.

Smith further alleges that on said date, to wit, July 26, 1933, the loan company did pay to him 75 per cent. of the value of these certificates, but wrongfully and arbitrarily withheld 25 per cent. thereof. Smith also seeks to recover dividends on his stock between the date of his application for withdrawal and the final recognition of the same by the loan company on July 25, 1933,

and interest on the money wrongfully withheld from that date to the date of the judgment. The first cause of action covered stock which was fully paid for in the amount of $21,000 on August 13, 1930, and the second cause of action concerns installment stock Class E on which Smith made an original deposit of $600 September 2, 1930, the value of which he alleges, by payments, dividends, etc., had increased to the total sum of $1,327.35 on October 14, 1931, plus dividends accruing thereafter. The plaintiff's petition does not disclose the excuse of the loan company for withholding the 25 per cent. which was withheld. The loan company filed an answer and later an amended answer, containing a general denial with an admission of the allegations concerning the investments made by Smith. The loan company admits the demand for withdrawal and admits the refusal to pay dividends, alleging as a defense that other stockholders who had withdrawn their stock had likewise been refused dividends pending the retirement of the same, claiming that payment of dividends would result in want of mutuality and would be a violation of the fundamental principles of the loan company and other associations, and that the loan company acted in accordance with an opinion of the Attorney General of the state of Oklahoma.

The loan company, as further defense, sets forth that the sums which were paid to the plaintiff represented 75 per cent. of the value of such certificates, and says that the amount so paid to the plaintiff was that amount which was fixed by the Banking Department of the state of Oklahoma under an order issued by the Banking Department on July 22, 1932, a copy of which was attached to the defendant's answer.

An examination of this order discloses that the Bank Commissioner, after reciting in a lengthy preamble the existence of a nation-wide depression in real estate values and the necessity for saving the loan companies from the necessity of meeting in full all demands for withdrawal as the funds are received, and in view of the situations recited, ordered and directed the Oklahoma City Building & Loan Association, in honoring withdrawals of shareholders, to retain 25 per cent. of the book or par value of the stock until such losses as might be suffered by the Building & Loan Association are determined and fixed, and until further order of the Bank Commissioner and the Building and Loan Board of the state of Oklahoma. The loan company was required, upon paying 75 per cent. to the withdrawing

stockholder, to stamp on the face of the certificate the fact that the remaining 25 per cent. was withheld by order of the Bank Commissioner of Oklahoma. He ordered the Building & Loan Association to pass new by-laws, or amendments thereto, to conform with the regulations contained in the order.

The defendant then filed a cross-petition against the plaintiff in the action, setting forth that the loan company had acted under the statutes of Oklahoma, requiring 30 days' notice from a withdrawing stockholder prior to withdrawal, and permitting the loan company to apply only one-half of the receipts of the company to the retirement of withdrawal demands.

The loan company then sets forth the order of the Bank Commissioner, previously referred to, stating that the purpose of the order was to preserve the mutuality of the defendant association and to render certain that each stockholder should receive the amount he was entitled to, and that the assets of the loan company should not be depleted unfairly but conserved for the benefit of the stockholders equally. The practical effect of the order is alleged to be that of preventing the loan company from paying more than 75 per cent. of the withdrawing stockholder's demand. It alleges then that, acting pursuant to such order, it has paid out to other stockholders a total of $250,997.43, representing only 75 per cent. of the demands of withdrawing stockholders. It then alleges that if plaintiff had received 100 per cent. of the par value of his stock, he would not have been entitled to receive anything on the date of July 26, 1933, but would have been compelled to await the payment of his demands on withdrawal out of subsequently accruing funds. The loan company therefore requests the court to compel the plaintiff to restore to the treasury of the loan company that which was paid to him on July 26, 1933. The plaintiff then replied to the answer and cross-petition. Thus the issues stood between the plaintiff and defendant at the time of the trial of the case.

By permission of the district court, W. J. Barnett, Bank Commissioner and ex officio chairman of the Building and Loan Board, and members of the Building and Loan Board of the state of Oklahoma were permitted to intervene in the case as defendants, and as additional defendants they appeared at the time of the trial of the case. Because of the view hereinafter expressed as to the validity of the Bank Commissioner's order,

upon which the loan company acted in withholding 25 per cent. of the value of plaintiff's stock, it is not necessary to set out in detail the allegations contained in the Bank Commissioner's answer, following in general the cross-petition of the defendant in the case. The order does not purport on its face to be an order taking possession of the affairs of the loan company in accordance with the statutes of the state of Oklahoma, and the order is not based upon any statement or claim by the commissioner that the defendant loan company is in any wise an insolvent concern.

Diverging temporarily from the question of pleadings, it may be noted here that in the brief of the Building & Loan Company filed in this action it is admitted and stated in no uncertain terms that the Building & Loan Company is solvent and has always been a solvent, going concern.

On the issues thus framed the case came on for trial February 6, 1934. The case was tried partly upon a stipulation of facts and partly upon testimony introduced.

The stipulation admitted the purchase by the plaintiff of the certificates of stock in question, and copies of these stock certificates were included in the stipulation.

The conditions upon which the certificate is issued are as follows:

"Conditions upon Which This Certificate Is issued.

"First: In addition to the initial payment the holder of the certificate may make additional payments in any amount and at any time.

"Second: Thrift Shares participate in the net earnings of the Association at the rate of six per cent. per annum provided the Association has earned so much for all other classes of shares; and in case it does not these shares shall participate at the same rate of earnings as other classes of shares.

"Third: Thrift shares may be withdrawn at any time upon 30 days notice, in writing. Upon presentation of the Pass Book Certificate properly endorsed the holder shall receive the total amount paid in together with all dividends credited. No cancellation or membership fee will be charged upon this Certificate.

"Fourth: Whenever the sums paid on this Pass Book Certificate, together with the dividends credited thereto shall reach the sum of $100 for each share represented the Certificate shall be deemed matured and must be reinvested or surrendered for cancellation.

"Fifth: The Association will not be bound to pay out on the withdrawal of any stock whatever during any one month more than one-half of its receipts for that month and stock of all sorts filed for withdrawal shall be paid in the order in which application is filed and notice given, and without regard to kind or class or stock. And, if the Association is indebted on matured shares, not more than one-third of the receipts of any one month shall be paid for withdrawals during that month, except on the order of the Board of Directors."

Payment of the 75 per cent. on July 26, 1933, is admitted. It is also admitted that no dividends were credited on the stock in either case after the 1st of January, 1932, following the notice of withdrawal on October 14, 1931, but it is admitted that three dividends were declared as to stockholders who had not given notice of withdrawals, as follows: July 1, 1932, 2 per cent.; January 1, 1933, 2 per cent. and July 1, 1933, 1 per cent.

It is further stipulated that the loan company was duly organized, its capital having been originally $500,000, and having been increased to a total of $40,000,000; that its by-laws were duly adopted and approved by the State Building and Loan Board and Bank Commissioner. A copy of the by-laws is attached. It is unnecessary to enumerate all of the by-laws of the company or to refer to them other than partially.

Article III of the by-laws classifies the different kinds of stock which may be issued, consisting of installment stock, full paid stock and prepaid stock. Class E installment stock may be issued at any time in shares of the par value of $100, and stockholders may make payment in any amounts and at any time they desire. It is provided:

"This stock shall participate in the net earnings of the Association at the rate of six per cent. per annum, provided the Association has earned so much for all other classes of stock; and in case it does not, this class shall participate in the earnings of the Association at the same rate as other classes of stock.

"This stock shall mature when the amount paid together with the accumulated dividends shall reach the sum of $100 per share or par. Amended January 16th, 1928."

Section 3 of article III classifies full paid stock.

This section we quote as follows:

"Section 3—Full Paid Stock. Full Paid Stock may be issued at any time in shares of a par value of One Hundred Dollars and shall never be sold at less than par value.

Dividends or earnings at an amount expressed in the stock certificate issued, payable semi-annually—on the 30th day of June and the 31st day of December of each year —shall be paid thereon, provided that no dividends or earnings shall be paid thereon, provided that no dividends or earnings shall be paid if withdrawn within ninety days from date of issue at the request of the stockholder; provided further that in the event the Association has not earned so much for other classes of stock as provided for in the certificate issued hereunder, the earnings on Full Paid Stock for that particular dividend shall be at the same rate as paid on other classes of stock. Provided further that the Board of Directors have the power to lower the rate of earnings on this class of stock upon giving thirty days' written notice of their intention to do so, the rate not to exceed in any event seven per cent. per annum.

"Notice sent by ordinary mail to the last known address of stockholders as shown by the records of the Association shall be deemed sufficient notice to them of any change in the rate of dividends paid on Full Paid Stock."

It is to be noted in the case of Class E stock that it shall participate in the net earnings of the corporation at the rate of 6 per cent. per annum, provided the association has earned so much for all other classes of stock; and in case it does not, Class E stock shall participate in the earnings of the association at the same rate as other classes of stock.

It is to be noted in the case of full paid stock that dividends shall be paid on the basis of the amount expressed in the stock certificate, which provision in this case was that the holder of the certificate

"shall participate in the profits of the association at the rate of six per cent. per annum, and shall be paid dividends upon $100 for each share represented by the certificate at the aforesaid rate, payable semi-annually on the 30th day of June and 31st day of December of each year, according to the terms of dividend coupons hereto attached; provided the association has earned so much for all classes of stock and in case the association does not, this certificate shall participate at the same rate as other classes of stock."

Section 8 of article III, relating to the withdrawal of stock by stockholders, is in full as follows:

"Section 8—Withdrawals. Certificates of Stock may be withdrawn by giving thirty days' notice in writing to the Secretary, and the holders thereof shall be paid as follows, to wit:

"Installment and Pre-paid Stock of all

Classes shall be entitled to receive the full amount paid in, together with all accredited dividends, less any fines, fees, liens, or assessments that may be charged against it.

"Full Paid Stock shall be entitled to receive the full amount paid in with dividends thereon at the rate expressed in said certificate if more than ninety days old, and provided if said stock is withdrawn by the holder thereof after the payment of a dividend and before said Stock is ninety days old, that the amount of the dividend so paid shall be withheld from the final payment.

"The Association will not be bound to pay out on the withdrawal of any Stock whatever during any one month more than one-half its receipts for that month and Stock of all sorts filed for withdrawal shall be paid in the order in which application is filed and notice given, and without regard to the kind or class of Stock. And, if the Association is indebted on Matured Shares not more than one-third of the receipts of any one month shall be paid for withdrawals during that month, except on the order of the Board of Directors."

It will thus be noted in the section relating to withdrawals that no specific or clear provision is made as to whether the withdrawing stockholder shall be entitled to dividends on his stock until the time when "the necessary funds are available under the statutes and by-laws of the association."

It is to be noted that this particular provision of the by-laws does not contain any provision penalizing the withdrawing stockholder by denying him dividends during the period while he is waiting to retire the certificate under the statute. It is also to be noted that the loan company in this section of its by-laws attempts to diverge from the exact provisions of the statute which provides that the association shall not be bound to pay out on withdrawal in any one month more than one-half of its receipts for that month, by providing that if the association is indebted on matured shares, not more than one-third of its receipts for any one month shall be paid upon withdrawals for each month, except upon order of the board of directors.

At the present time this provision does not seem to us to have any particular effect upon the judgment which is to be rendered in this case, although it is entirely conceivable that a contention might be made that the corporation was bound to use at least one-half of the funds instead of one-third of the funds to meet the demands of withdrawing stockholders.

The matured shares referred to appear from section 2 of article III to be stock which has matured in value and which may be surrendered for cancellation at any time after maturity.

Section 12, article III, relates to dividends, and we quote what we might deem to be the material provisions therefrom as follows:

"Section 12—Dividends. At the regular monthly meetings of the Board of Directors in the month of January and July of each year they shall declare such dividends as may accrue from the earnings of the Association, after deducting therefrom all expenses and losses, and also such sums as they may reserve for the payment of expectant losses. The dividends so declared shall be credited to the amount of the respective stock in proportion to the amount paid on such stock and the time such amount has been in the Treasury of the Association since the dividend day last preceding, and shall be credited on the pay days next after it is declared, and according to the provisions of these By-laws for the several kinds and classes of Stock. No dividends shall be credited to any Installment Stock until said stock is six months old, and six monthly payments made thereon, and a holder of such stock withdrawing before a dividend has been credited to his stock shall receive no dividends whatsoever."

Section 13 of the same article provides a method by which losses shall be paid before dividends are declared.

So far as we can find, from a careful examination of these by-laws, there is nothing in them which authorizes the loan company to withhold any money from a withdrawing stockholder on account of losses or potential losses or depression in the value of the assets of the loan company, other than to withhold declaration of dividends until such time as losses are taken care of.

It appears that the Legislature of Oklahoma, under chapter 54, Session Laws of 1933, effective May 5, 1933, amended the section of the Oklahoma statutes relating to the withdrawal of funds so as to provide that the withdrawing stockholder should receive "such proportion of the profits as the by-laws may determine, less all fines and other charges and less a proportionate share of any loss sustained by such an association," the last clause, which is emphasized, being the amendment. After the adoption of this statute and issuance of the order of the building and loan association, and to wit, on October 16, 1933, after the filing

of plaintiff's petition, after the filing of his notice of withdrawal, and after plaintiff's cause of action is alleged to have arisen, the Building & Loan Association adopted an amendment to the by-laws so as to conform to both the provision of the 1933 Statutes above referred to, and the 75%-25% order of the Bank Commissioner. In this amendment it was provided that the withdrawing shareholder should not become a creditor of the association, but his status should remain that of a shareholder until he is paid in full, and we do not understand that it is seriously contended by the loan company that this latter amendment to the by-laws affected the rights of the plaintiff in this case.

The stipulation of facts further specified that the loan company had made its usual reports and had been regularly inspected and had received its semi-annual certificate.

It was also shown by the stipulation that up to March 17, 1931, defendant had at all times immediately met the demands of the withdrawing stockholders, but that on March 17, 1931, because of the fact that withdrawals were being filed faster than the defendant could accumulate money for their payment, the board of directors passed a resolution requiring all withdrawing stockholders to give the full 30 days' notice required by the statutes. It is further stipulated that after March 17, 1931, the loan company enforced this order of the board of directors. Notices of withdrawal thereafter were numbered serially in the order in which they were filed, and that on and after that date, March 17, 1931, withdrawing stockholders were paid in accordance with the terms of the by-laws in the order in which their notices were filed and as the funds were accumulated, and that from that date and until the receipt of the 75%-25% order of the Bank Commissioner, the loan company had paid their stockholders in full as their withdrawal notices were reached in their numerical order, and as they had the funds on hand. This situation, therefore, existed when the plaintiff's withdrawal notice was filed on October 14, 1931, and up to July 22, 1932. It was then stipulated that the Bank Commissioner entered his order on July 22, 1932; that it was received by the loan company on July 24, 1932, and that since that date the loan company has obeyed the order in payments to withdrawing stockholders.

It was also agreed that on July 22, 1932, the notices of withdrawal amounted to $1,217,439.36 in the defendant loan company, and that it had cash at said time of $66,-

403.31. A list of its real estate loans and real estate owned, by cities and towns, was annexed, together with a statement of loans it had in foreclosure. It was also stipulated that the defendant loan company had had its properties appraised by disinterested appraisers, and that this appraisal showed a loss of $188,180, which was slightly more than 10 per cent. of the amount invested.

The stipulation further showed that since the order of the Bank Commissioner had been made and up to the date of the trial, which commenced February 6, 1934, there had been paid out to withdrawing stockholders the sum of $255,977.43 on a 75 per cent. basis, the sum of $85,332.34 having been withheld on the Bank Commissioner's order.

The December, 1933, semi-annual statement of the company was attached, showing its assets and liabilities. Other financial statements for other periods, both before and after the notice of withdrawal by the plaintiff, were offered in evidence and admitted.

Mr. W. R. McWilliams, vice president and manager of the Building & Loan Company, was called as a witness and admitted that in making settlements with the borrowing stockholders on their stock, no charge was made against the borrowing stockholders for any losses of the company and their stock was accepted during all of this period of time at full face value plus any dividends which might have been declared. That the company carries all properties acquired on mortgage foreclosure at the book value, and that no reduction on account of loss in real estate had been entered upon the books of the company and unless and until, of course, the property is sold at a loss.

Other testimony concerning the profits earned by the company was introduced. This testimony, in consideration of the view which we take, is not particularly material, and we will not burden the record further with it. A great deal of the testimony of Mr. McWilliams thereafter deals with the question of foreclosures, potential loss, distress loans, and things of that character.

On final redirect examination by Mr. Barry, Mr. McWilliams admitted that on August 21, 1933, the date on which plaintiff's suit was filed, there was enough money in the withdrawal account of the loan company to pay the full remaining 25 per cent. of the plaintiff's stock if the company had maintained payments to its withdrawing stockholders on 100 per cent. basis instead of the 75%-25% basis. This testimony is

the only testimony in the record, so far as we can find, as to any definite date on which the loan company could have discharged its full obligation to the plaintiff in this case as a withdrawing stockholder, and there is nothing whatever from which we can presume that the loan company at any time prior to that date had on hand sufficient money to pay off the plaintiff as a withdrawing stockholder, if it had followed the statutory method of paying off each stockholder in full in consecutive order.

It therefore appears that at least on August 21, 1933, the loan company could have paid off the plaintiff in this case in full if it had followed the method of paying each withdrawing stockholder in full in consecutive order, instead of paying on the 75%-25% basis.

Smith, the plaintiff in the case, then testified that he had made demand for full payment, and that demand had been refused; that the loan company had refused to permit him to collect the dividends on his stock from and after October 14, 1931, the date of his notice of intention to withdraw, and had refused to pay him interest thereon.

The remainder of the testimony in the case consists largely of evidence on behalf of the Bank Commissioner as to the status of building and loan associations in the state of Oklahoma and that of the defendant loan company.

It is clear from the evidence that the Bank Commissioner did not declare the defendant loan company to be insolvent and did not take possession of the defendant Building & Loan Association under the provisions of the statutes of Oklahoma, and it is equally clear that defendant loan company was never insolvent and was not insolvent at the time of the trial of the case. It is equally clear from the evidence that the defendant loan company continued as a going and operating concern over the entire period.

Over the objection of the plaintiff, the loan company introduced reports to the Bank Commissioner of the state of Oklahoma. These reports, it is to be noted, were made as of the close of business March 24, 1932, and show that between March 17, 1931, and March 24, 1932, there had been applications for withdrawal in the defendant loan company in the amount of $3,367,125.63, and that there had been paid and canceled 725 of these notices, amounting to $2,254,-867.20, leaving unpaid notices aggregating

$1,112,258.43. Plaintiff's withdrawal notice in this case was No. 835. Thus it will be seen that there were 110 withdrawing stockholders ahead of the plaintiff on March 24, 1932.

It is shown from this report that the average monthly income of the loan company was approximately $200,000.

It is shown that of the money paid to withdrawing stockholders $1,214,558.67 had been paid to stockholders who had filed their notices of withdrawal and **$1,127,740.70 paid to those who had not filed notices of withdrawal.** It is to be noted in this particular that the loan company violated its own order, according to the report to the Bank Commissioner, after March 17, 1931, by paying out large sums of money to stockholders who did not file notices of withdrawal. What effect this could have upon the time of the maturity of the plaintiff's demand for withdrawal we cannot say, because the record does not give a schedule of the notices of withdrawal.

It would, therefore, appear that a preference had been given stockholders who filed no notices of withdrawal. Examples of this are given in the report to the Bank Commissioner. It therefore appears that about half of the money paid out to withdrawing stockholders was paid out to those who filed no notice, contrary to the rule adopted by the loan company on March 17, 1931.

On the 14 day of April, 1934, the court convened for further consideration of this case, and at that time the trial court, though expressing some doubt as to the power of the Bank Commissioner to make a blanket order, found that this 75%-25% order of the Bank Commissioner was valid, and while finding that the Building & Loan Associations were not actually insolvent, they were in a condition of "potential" insolvency. The trial court found that the order of the Bank Commissioner should be enforced; that the plaintiff was not entitled to dividends during this waiting period, and that the plaintiff was not entitled to recover judgment for the 25 per cent. withheld nor for interest thereon. Judgment was rendered in favor of the loan company and against the plaintiff in the case. Motion for new trial was duly filed and overruled, and this appeal was perfected from the judgment so entered.

Plaintiff in error briefed the case on the basis of the issue framed by the pleadings and the facts offered at the trial of the case. It appears, however, from the brief of the defendant in error that on November 13,

1934, the loan company paid to the plaintiff in the case the 25 per cent. of his stock previously withheld and after the appeal was lodged in the Supreme Court. This was paid upon a stipulation between the parties in which it is recited that the Bank Commissioner has withdrawn the 75%-25% order against the defendant loan company, and the loan company is now ready to pay him his 25 per cent., and he wishes to receive it, and it is agreed that the loan company shall pay him the 25 per cent, formerly withheld without any prejudice to the litigation now pending and without any prejudice to the rights of the parties to prosecute the litigation in the Supreme Court of Oklahoma, and that the question of the payment shall not be made a part of the litigation, and the lawsuit should be prosecuted to a final conclusion.

It appears also from the record that there are other cases pending in the Supreme Court involving the same question.

The loan company takes the position on appeal that the question of the validity of the 75%-25% order is moot, and that it is unnecessary to determine moot questions, and cites authorities from the Supreme Court of Oklahoma in support thereof. In his response the plaintiff in error expresses great surprise that the loan company should present the conditions of the agreement or ask the Supreme Court to consider the question as moot. Counsel for plaintiff in error cite the case of C. C. Julian Oil & Royalties Co. v. Capshaw, 145 Okla. 237, 292 P. 841, involving the proration laws of the state of Oklahoma, to the effect that where the question is of great public importance the court will pass upon questions so that the law may be settled for the guidance of public officials, irrespective of the dismissal.

We do not consider the question to be moot. If the order of the Bank Commissioner is void or beyond his jurisdiction, the plaintiff in the case was entitled to receive in full his money as a withdrawing stockholder, in his consecutive order, when the funds were accumulated by the loan company from its receipts, in accordance with the statutes of the state of Oklahoma. - If, therefore, the loan company wrongfully refused to pay plaintiff this 25 per cent., the loan company would be obligated to the plaintiff to the extent of interest on the date thus created at the rate of 6 per cent. per annum, under the laws of the state of Oklahoma, as a matured demand, and therefore the case still involves the question of interest on the portion withheld, and is therefore not moot. We have not been given the benefit of a brief on the part of the loan company on the question of the validity of the Bank Commissioner's 75%-25% order on this appeal, but the matter was thoroughly briefed by the plaintiff in error. It should have been answered by the defendant in error.

However, in view of the wide public importance of such an order, and the fact that it affects many building and loan associations in the state of Oklahoma, and involves still the question of interest which may be collected by the plaintiff in error during the time this portion of his funds were withheld, we have made a very careful study of the laws of Oklahoma which relate to the validity of this order, aside and apart from the authorities which were presented in the brief of the plaintiff in error, and have endeavored to view the matter from both sides of the question, for the purpose of determining the validity of the order, since a determination as to its validity is essential to a determination of the question of interest payable to the plaintiff in error, during the time his moneys were withheld, if they were withheld improperly. This brings us therefore to a consideration of the questions involved in this appeal, and we will discuss them in the following order:

(1) Whether the withdrawing stockholder is entitled to dividends upon his stock, as and when dividends are declared payable upon the stock of other stockholders of the corporation, from the time of the filing of his notice of intention to withdraw until the funds are available for retirement of his certificates of stock;

(2) Whether the 75%-25% order of the Bank Commissioner of the state of Oklahoma is valid and effective and whether the loan company had authority by virtue thereof to withhold a portion of the funds otherwise payable to a withdrawing stockholder; and,

(3) Whether the stockholder is entitled to receive interest on the portion of his funds withheld after the same were payable under the laws of the state and by-laws of the corporation.

1. After an examination of the authorities and a careful consideration of the statutes of Oklahoma and the by-laws of the defendant loan company, we are convinced that when a withdrawing stockholder in a domestic building and loan association files his notice of his intention to withdraw, he is entitled to receive his just proportion of

the dividends of the corporation, the same as all other stockholders, from the time of the filing of his notice of intention to withdraw to the date when, under the laws of the state of Oklahoma and by-laws of the company, he becomes entitled to receive payment of the amount due him on withdrawal. If the corporation at the time of the giving of such notice is in a position financially to meet his demand for withdrawal immediately, his right to participate in subsequent dividends of the corporation ceases at the expiration of 30 days from the filing of notice of withdrawal or upon the retirement of his stock, if the corporation elects to retire it before the expiration of the 30-day notice. If, on the other hand, the corporation, under the proviso to section 9800, Okla. Stats. 1931, reading as follows:

"Provided that at no time shall more than one-half of the funds in the treasury of the corporation be applicable to the demands of withdrawing stockholders. without the consent of the board of directors. * * *"

—sees fit to withhold its consent to the withdrawal of such stock by such stockholder, this action on the part of the corporation is in effect an enlargement of the previous requirement of the 30 days' notice and suspends the withdrawal until the funds are accumulated in the hands of the corporation with which to pay the withdrawing stockholder under this proviso; and the stockholder is entitled because of such action of the corporation, through its board of directors, to dividends declared between the date of his notice of withdrawal and the expiration of the period of suspension created by this action of the board of directors.

We give our reasons below:

The contention urged by the loan company on this point would, if sustained, have the peculiar effect of leaving the withdrawing stockholder suspended in midair, classified neither as "flesh, fish nor fowl." He would be neither a stockholder nor a creditor. To hold to this effect, in view of the facts involved in this case, would lead to a mild absurdity, at least.

The parties have submitted many authorities on both sides of the question and none of them seem to be entirely conclusive on the point, though many of them, as hereinafter stated, are at least persuasive. We find no situation in any of these cases which can be said to be absolutely identical to the situation in the case at bar. We are compelled in this case to determine the question upon the basis of the statutes of Oklahoma and the provisions of the by-laws of the defendant corporation as they existed at the time of the filing of the notice of intention to withdraw.

The section of the statute relating to this matter is section 9800, Okla. Stats. 1931, and we quote from that section as follows:

"* * * The stock may be issued in one or more successive series, in such amount as the board of directors or stockholders may determine, and any stockholder wishing to withdraw from said corporation shall have power to do so by giving thirty days notice of his intention to withdraw, when he shall be entitled to receive the amount paid in by him, **and such proportion of the profits as the by-laws may determine,** less all fines and other charges: Provided, that at no time shall more than one-half of the funds in the treasury of the corporation be applicable to the demands of withdrawing stockholders without the consent of the board of directors and that no stockholders shall be entitled to withdraw whose stock is held in pledge for security. * * *"

It is to be noted that the withdrawing stockholder is entitled to two things: (1) The amount paid in by him; and (2) such proportion of the profits as the by-laws may determine. It is also to be noted that not more than one-half of the funds of the treasury of the corporation shall be applicable to the demands of withdrawing stockholders "without the consent of the board of directors."

It, therefore, appears that the corporation may enlarge the 30-day period specified by the statute to a time in the future determined by the accumulation of funds. If the stockholder is denied the right to receive his money 30 days from the date of his notice of withdrawal pursuant to this provision of the statute, his investment in the stock remains in the corporation and is used by the corporation in the conduct of its business affairs. It earns at least some money for the corporation along with the money which belongs to nonwithdrawing stockholders.

In order to have a complete understanding of the matter and reach a conclusion, it is therefore necessary to have recourse to the provisions of the by-laws of the corporation relating specifically to withdrawals. That by-law as it existed on the date when plaintiff's notice of withdrawal was filed is section 8 of article III, which is as follows:

"Section 8—Withdrawals. Certificates of stock may be withdrawn by giving thirty

days' notice in writing to the secretary, and the holders thereof shall be paid as follows, to wit:

"Installment and Pre-paid Stock of all Classes shall be entitled to receive the full amount paid in, together with all accredited dividends, less any fines, fees, liens, or assessments that may be charged against it.

"Full Paid Stock shall be entitled to receive the full amount paid in with dividends thereon at the rate expressed in said certificate if more than ninety days old, and provided if said Stock is withdrawn by the holder thereof after the payment of a dividend and before said Stock is ninety days old, that the amount of the dividend so paid shall be withheld from the final payment.

"The Association will not be bound to pay out on the withdrawal of any Stock whatever during any one month more than one-half its receipts for that month and Stock of all sorts filed for withdrawal shall be paid in the order in which application is filed and notice given, and without regard to the kind or class of Stock. And, if the Association is indebted on Matured Shares not more than one-third of the receipts of any one month shall be paid for withdrawals during that month, except on the order of the Board of Directors."

An examination of this section discloses that there is no provision of any kind or character by which the defendant loan company has sought to withdraw the right to participate in dividends from its stockholders who give notice of intention to withdraw. It is clear to us that the withdrawal is not complete until the date has been reached when the withdrawing stockholder is entitled to receive the value of his stock. This date is determined by ascertaining the number of notices filed prior to the filing of the notice by the plaintiff and the amount represented by such notices of withdrawal and by determining the funds on hand available under the statutes of Oklahoma and by-laws of the loan company for the retirement of the stock of withdrawing stockholders. This is a mathematical matter and a matter susceptible of exact ascertainment; until that point is reached the withdrawal has not been complete.

The stockholder is deprived of the use of his money during this period of time and it is clear from the overwhelming weight of authority that the stockholder is not entitled to interest on the amount represented by his withdrawal until under the by-laws and the statutes of the state he is entitled to receive his money.

Unless there is a clear provision in the statutes or in the by-laws of the loan company which deprives him of his dividends during this period of time, we think it clear that he is entitled to receive dividends as a stockholder until he is entitled to receive interest as a creditor. In order to reach a different conclusion we would be compelled to construe into his contract something which we do not find in it, in the statutes of the state, or in the by-laws of the loan company. If it had been intended that the stockholder should be deprived of this right to dividends during such period of time, it undoubtedly would have been so provided, either in the statutes of the state governing the question or in the by-laws of the corporation affecting withdrawals. We do not undertake at this point to say whether he could be constitutionally deprived of the right to collect these dividends, as that is not necessary to a judgment in this case. We merely say that it was not so done in this case.

In addition to the absence of such a provision in the section of the by-laws relating to withdrawals, we find no limitation in section 3 of article III, relating to full paid stock, or section 2 of article III, relating to installment stock, Class E, those being the two classes owned by the plaintiff in the case, or in section 12 of article III, relating to the payment of dividends on the various classes of stock.

Manifestly, if this earning power of the stockholder's money is to be withdrawn from him, it must be done under some clear provision either of the statutes, the by-laws or the contract itself.

While the statutes, the by-laws and the certificates of stock do not in express terms grant to the withdrawing stockholder the right to participate in dividends, it is clear from a careful reading of them that it is intended that the stockholder shall receive dividends on his stock during the period of his investment in the loan company. His investment unquestionably remains in the loan company until, on withdrawal, it is retired.

There are expressions in some cases and in some opinions which seem to justify the conclusion that the writers of such opinions were under the impression that from the moment of the stockholder's withdrawal, or from the expiration of 30 days from the filing of this notice, his money is no longer available for investment in the loan company. We do not think this a correct conclusion in this case. It is true that the money, if on hand in cash, is not available for future investments, but the inability of

the loan company to pay to the withdrawing stockholder the value of his stock is due to the fact that his money is already invested and drawing interest for the loan company and for that reason is not available in cash.

It appears from a report to the Bank Commissioner, introduced in evidence by the loan company, that its monthly receipts aggregated as high as $280,000, and averaged during the period of time under consideration more than $200,000 per month. This withdrawing stockholder is not affected by previous withdrawing stockholders, except that his right to have his stock retired is deferred until those who have previously filed notices have received their money. Consequently, he is not entitled to receive any portion of the money received by the company during that time when his right to retirement is thus suspended. His part of the capital of the company remains invested until the previous withdrawing stockholders have been retired. When the point is reached when the first dollar comes into the company out of which he is entitled to have reimbursement, to the extent of 50 per cent. of such dollar, the first point is then reached when his funds are not employed by the company. Since the receipts in any one month over this period of time aggregated approximately $200,000, it is perfectly obvious that the plaintiff's demand for retirement, aggregating less than $24,000, could be met in less than 30 days from the date on which the first dollar is available for its retirement. It therefore cannot be said truthfully or properly that his money has no earning capacity, except as to that small period of time elapsing between the time when his first dollar is available and when his last dollar is available; which in the case at bar is much less than 30 days.

It would therefore be a manifest injustice to deprive him of the earning capacity of his investment. He is not a creditor until the time for retirement has arrived under the statutes and by-laws; until then his investment remains with the company. In justice, therefore, he should be entitled to dividends the same as any other stockholder whose funds are invested in the affairs of the corporation. In the instant case the loan company saw fit to avail itself of every method under the statute and by-laws of withholding the retirement of the plaintiff's stock and required him to adhere strictly to all of these provisions. We cannot read into his contract or into the statutes or by-laws of the company a provision which deprives him of his share of the

profits of the company during this period of suspension.

Section 9800, above referred to, does not provide that he shall be entitled to receive such proportion of the profits **already earned,** but such profits as the by-laws may determine. If the by-laws had deprived him of his right to dividends during this period of suspension, another situation would have been presented. We are not called upon to pass upon the validity of such a provision. In reaching this conclusion we have given due consideration to all of the cases cited by both plaintiff in error and defendant in error, and we do not believe any of them are sufficiently parallel to justify the conclusion that they are controlling in this case. However, we do believe that most of them, if analyzed carefully, will lead to the conclusion we have above outlined.

We find only two cases which seem to be in point on this question. Most of the cases cited by the loan company turn on other questions and are not conclusive on the point involved in this case.

The two cases which we think most clearly outline the law and its applicability to the case at bar are Fredrick v. Mutual Building & Investment Co. (Ohio) 191 N. E. 729, cited by the plaintiff, decided May 16, 1934, and the case of Home Building & Savings Association v. Clay, 188 Ark. 943, 68 S. W. (2d) 103, decided February 19, 1934. This latter case was not cited by either party, but we believe it is conclusive on the questions involved.

The case of Home Building & Savings Association v. Clay, supra, contains a very thorough discussion of the status of a withdrawing stockholder between the time of the service of his notice of withdrawal and the time when the funds are available for the purpose of retiring his investment. It refutes a number of the cases cited by the loan company, and calls particular attention to the fact that the case of United States Building & Loan Association v. Silverman, 85 Pa. 394, cited by the loan company, has been repudiated in Pennsylvania in the case of Stone v. Schiller Building & Loan Association, 153 Atl. 758. It also calls attention to the fact that in Heinbokel v. National Savings, Loan & Building Association (Minn.) 59 N. W. 1050, cited by defendant loan company, the rule in the Silverman Case was classified as manifestly erroneous in putting the stockholder in the position of a general creditor upon service of with-

drawal notice. In the Heinbokel Case the court says:

"The conclusion in the case just mentioned (Silverman Case) loses potency when we discover the reasoning is unsound."

Since we consider the case of Home Building & Savings Association v. Clay to be directly in point, we will quote extensively from the case.

Among the various things which are decided in the Home Building & Savings Association v. Clay Case is that the solvency of a building and loan association cannot convert a withdrawing stockholder into a general creditor, although he may be in a sense a qualified creditor. It is also held in that case that the maturity of fully paid stock in a building and loan association and demand for its payment does not change the relationship of a stockholder from a member to that of a general creditor.

Clay, prior to September 2, 1931, was the owner of matured stock in the Building & Savings Association, and on that date he surrendered the same and received in exchange therefor a certificate for $1,000, which was sued upon. This certificate is headed as follows:

"Without Banking Privileges
"Number 721                    Ten shares
"Home Building and Savings Association
"Ft. Smith — Little Rock — Dallas
"Six per cent Full Paid Stock."

The certificate then contains the promise upon 30 days' notice, after one year, to pay J. F. Clay $1,000, with unpaid dividends. The certificate is made subject to the by-laws of the company and the laws of Arkansas. Clay contends that under this certificate he was a general creditor of the company and entitled to recover, and that he was not a stockholder. We quote from the syllabus of the case as follows:

"1. A certificate given to the owner of matured stock in a building and savings association on his surrender of the stock, stating that the association will pay a specified amount equal to the par value of the stock, with all unpaid dividends at a specified rate that have fallen due thereon, in consideration of which the owner waives all larger participation in the earnings of the association, and stating, further, that the certificate is subject to the laws of the state and the by-laws of the association, does not create the relationship of general creditor but that of a stockholder subject to the by-laws of the association.

"2. The maturity of fully paid stock in a building and savings association, and a demand for its payment, do not change a member's relationship from a stockholder to that of general creditor.

"3. The solvency of a building and loan association cannot convert a withdrawing stockholder who may be, in a sense, a qualified creditor, into a general creditor, so as to entitle him to payment of his stock before payment of stockholders who have previously withdrawn, in violation of a by-law of the association that application for withdrawals shall be paid in the order filed as fast as funds are available for that purpose, and that no more than half of the monthly receipts of the association in any month shall be applicable to the payment of withdrawals for that month, except by consent of the board of directors."

We quote from the opinion as follows:

"It is the contention of the appellee, to which the trial court assented, that the relationship created by the foregoing instrument was that of debtor and general creditor. The appellee here argues that the certificate did not create him a stockholder in the association, but, if so, that at the expiration of thirty days' notice of demand for payment such relationship ceased and that of debtor and creditor arose. In support of this contention, appellee has referred us to a number of cases which seem to sustain the position he has taken. Among these are: Wise Bros. v. Yazoo Building & Loan Ass'n, 105 Miss. 78, 62 So. 1; Eastern Bldg. & Loan Ass'n v. Williamson, 189 U. S. 122, 23 S. Ct. 527, 47 L. Ed. 735; Silvers v. M. & M. Sav. Fund & Bldg. Ass'n (N. J. Ch.) 56 A. 294; State ex rel. Gray v. Active Bldg. & Loan Ass'n, 80 Mo. App. 585. The doctrine of these cases appears to be founded on the case of U. S. Bldg. & Loan Ass'n v. Silverman, 85 Pa. 394, holding that in building and loan associations the status of a withdrawing member is changed from that of member to that of general creditor.

"It is insisted by the appellee that the form of the certificate is conclusive of the relationship, and that an inspection of it discloses that it is an obligation for the payment of money; that it is not in form a stock certificate and does not indicate that the appellee was the owner of stock or a member of the association, and, since it is an obligation to pay a certain sum of money, it is not a stock certificate, nor was the appellee a stockholder, and therefore the by-laws of the association would not apply. This position cannot be maintained because the certificate is not an unconditional obligation to pay a sum of money at a time stated or upon the happening of certain contingencies; the promise to pay being limited by the statutes of this state and the by-laws of the association, which are expressly made a part of the contract.

"The association is a mutual building and loan association, operating under the provisions of Act No. 128 of the Acts of 1929 (page 659), as amended by Act No. 236 of the Acts of 1931 (page 726), digested in Castle's Supplement 1931, sec. 750a et seq. Mutual building and loan associations are permitted by statute to provide by their by-laws the several kinds of classes of shares, stock, or certificates which it may issue and to prescribe the reciprocal rights and powers of the owners of the several classes of stock. Authority is given for the withdrawal of credits on any or all classes of shares, stock, or certificates at such times and under such terms and conditions as the association may prescribe by its by-laws. The statute also provides that the withdrawals shall be paid in the order of filing, and that not more than 50 per cent. of the monthly receipts of the association, in any one month, may be paid upon such withdrawal applications.

"The by-laws of the association provide that all of those who become in any way the owner of one or more shares of the capital stock or certificates of the association shall be members of the same; that each member present at any meeting of the association in person or by proxy, shall be entitled to one vote for each $25 of value of stock or certificates held by him. They provide further for various classes of stock to be paid for in installments or to be fully paid when issued, the fully paid stock to be issued at $100 cash per share with such rate of interest or dividend and for such length of time as may be determined by the board of directors.

"Section 12 of the by-laws provides in part that at no time shall more than one-half of the monthly receipts of the association, in any one month, be applicable to the payments of withdrawals for that month, except by the consent of the board of directors; and further that applications for withdrawals shall be paid in the order filed as fast as funds are available for that purpose.

"Upon the issuance of the certificate it is clear that the appellee became the owner of ten shares of the value of $100 each of full paid stock, and, under the by-laws of the association, had a right to participate in its management, and it seems that he executed a written proxy authorizing certain persons to vote his shares of stock at any meeting of the association. It is argued that section 12, relating to withdrawals, does not apply to fully paid certificates of stock. No class of stock is excepted, but the statute expressly provides for the withdrawal of 'all classes of shares, stock or certificates.' Appellee says he did not give notice of withdrawal, but of demand for payment. The effect of a demand for payment would be notice to the association of the intention to withdraw membership, and whether it be called 'demand for payment' or 'notice of withdrawal' is immaterial, for the result would be the same, and the demand or application could not be paid in any event out of more than one-half of the monthly receipts of the association in any one month, and then only in the order of its filing. The maturity of the stock and the demand for its payment would not serve to change the relationship from stockholder to general creditor as contended. Our conclusion in this respect has the support of the weight of authority, and in Pennsylvania and New Jersey, where the rule was first announced as contended for by the appellee, later decisions seem to have abandoned it. Fornataro v. Atl. Coast, etc., Ass'n, 163 A. 240. 10 N. J. Misc. 1248, and Stone v. Schiller B. & L. Ass'n, 302 Pa. 544, 153 A. 758. In the last-named case the early case of U. S. B. & L. Ass'n v. Silverman, supra, is repudiated. In Heinbokel v. Nat. S. L. & B. Ass'n, 58 Minn. 340, 59 N. W. 1050, 1051. 25 L. R. A. 215, 49 Am. St. Rep. 519, referring to the doctrine that a stockholder ceases to be a member of the association after due notice of withdrawal and may, upon refusal of payment, sue and recover judgment as any other creditor, it is said: 'But it is obvious that a stockholder who withdraws from one of these associations cannot properly be regarded as having the rights of the ordinary creditor, and this was admitted by the same learned court (Pennsylvania) in a later case (Christian's Appeal, 102 Pa. 189), in which it was frankly stated that there was manifest error in the Silverman Case (U. S., etc., Ass'n v. Silverman, 85 Pa. 394) in putting withdrawing stockholders in the position of general creditors. The conclusion in the case just mentioned loses potency when we discover that the reasoning is unsound.'

"As already stated, the later Pennsylvania and New Jersey cases have abandoned the rule laid down in the Silverman Case and have adopted the contrary view, which has the support of our own court in Fort Smith B. Ass'n v. Cohn, 75 Ark. 497, 87 S. W. 1172, 1174. In that case certain stockholders had matured their stock in the association and were entitled to a designated sum under the terms of their certificates. They demanded payment, notice of which matured December 1, 1897. Instead of paying cash, the association executed its promissory note on February 25, 1899, for the sum demanded, payable February 25, 1900. On the 5th day of March, 1900, the association was declared insolvent by the chancery court, and receivers were appointed to administer its assets under the orders of the court. The holders of the notes intervened and prayed for judgment for the amount due as shown by the

notes on the theory that they were general creditors, invoking the rule contended for by the appellee in the case at bar. The trial court gave judgment for the note holders, but the Supreme Court reversed that judgment saying:

"'The court erred in rendering judgment for appellees as if they were creditors of the association. The proof shows that the association was insolvent at the time the notice of withdrawal was given, and continued so down to the time of the execution of the notes which are the basis of appellees' claims.

"'The proof tends to show that appellees suspected that the association was in a critical financial situation. But even if it be conceded that they did not know that the association was insolvent, still that would not affect the result here, for the indebtedness of the association to them, evidenced by the notes, grows out of the relation to the association as members. * * *

"'While appellees made an honest effort to withdraw, and thought they had withdrawn, and were treated, after expiration of their notice, as if they had withdrawn, so far as the payment of dues, etc., was concerned, yet, as a matter of fact actual withdrawal had not been consummated; for that could only take place by the payment for their stock.'

"The doctrine of these cases is that held by a majority of the courts. Among these are the following: Fornataro v. Atl. Coast B. & L. Ass'n, supra, where the rule of the earlier New Jersey cases is modified; Engelhardt v. Fifth Ward, etc. Ass'n, 148 N. Y. 281, 42 N. E. 710, 35 L. R. A. 289; Texas Homestead B. & L. Ass'n v. Kerr (Tex. Sup.) 13 S. W. 1020; Publicker v. Pottash Bros., etc., Ass'n, a late Pennsylvania case, 104 Pa. Super. Ct. 530, 159 A. 58; Andrews v. Roanoke Bldg., etc., Co., 98 Va. 445, 36 S. E. 531, 49 L. R. A. 659; Mutual Bldg. & Investment Co. v. Frederick, 43 Ohio App. 270, 183 N. E. 114; Rabbitt v. Wilcoxen, 103 Iowa, 35, 72 N. W. 306, 308, 38 L. R. A. 183, 64 Am. St. Rep. 152.

"The appellee calls attention to the fact that nearly all of the cases cited by the appellant arose where the association was insolvent, and that the rule in those cases is not applicable to the instant case, for the reason that the appellant association is a solvent and going concern. The fact that a building and loan association is solvent or insolvent cannot convert a withdrawal stockholder who may be in a sense a qualified creditor into a general creditor. It is true that a majority of the cases arose in insolvent associations, but there are a number where the association was a solvent and going concern, and the withdrawing member contended for the status of a general creditor and sought to have his demand reduced to judgment. Among these are those last above cited.

"In the case of Miers v. Columbia Mutual B. & L. Ass'n (C. C.) 157 F. 940, the court, in discussing a contention similar to that of the appellee in the case at bar last noted above, had this to say: 'The claimant contends that, assuming the solvency of the association at the time his withdrawal application was accepted, he is entitled to preferential payment; his status from that time being that of a creditor. The contention ignores the qualification of the liability of the association contained in the by-laws that not more than "one-half the monthly dues received in any month" shall be applied to the payment of withdrawing members.' A number of cases are cited, and the court continues: 'It is true that in some of the cases cited by the master the involved associations were insolvent, and in others they had ceased to do business and were unable to repay the dues paid by the withdrawing members; but, even assuming that the evidence in this case does not strictly disclose the insolvency of the respondent at the period of the withdrawal notice in suit, the claimant was nevertheless required to prove that available funds were in the possession of the respondent to meet the repayment demanded at the time of the appointment of the receivers.'

"In a majority of the cases holding that a withdrawing member is a creditor, there is no controversy involving the rights of the general creditors, the contentions being between the different classes of shareholders. The members, who had withdrawn and demanded payment for their certificates, claimed to be preferred and entitled to full payment before the other shareholders were entitled to anything. Those shareholders who had not given notice claimed that all the shareholders should participate equally in the distribution of the assets of the insolvent company. Some of these cases turn on the language of the statute and by-laws, and it is generally held in those cases that the right of the withdrawing shareholder to receive payment must be limited to the manner prescribed by the by-laws and payable out of the funds made applicable thereto.

"In Rabbitt v. Wilcoxen, supra, the court said: 'It seems to us that these authorities, as well as the language of the by-laws of the association in this case, fix a limitation on the rights of withdrawing shareholders as to the funds applicable to the payment of their claims, and that beyond such limit they cannot go. In this case there is, confessedly, no such fund available. * * * Insolvency but adds to the strength of such a position.'"

This case, it seems to us, containing a

review of the various authorities, is a conclusive answer to all of the contentions made by the defendant loan company.

We are inclined, on the other hand, to believe that while the case of Fredrick v. Mutual Building & Investment Co. (Ohio St.) 191 N. E. 729, is not identical to ours, it is at least persuasive in the matter. In that case it was held that a by-law providing that the stockholder's right to dividends should cease on giving withdrawal notice applied only when the financial condition of the association permits the return of the stock deposit to the withdrawing member. In that case it was provided that the application should be received and paid in the order in which it was filed, "as fast as the receipts of the company from payments on the principal of said mortgages will, in the judgment of the board of directors, permit. Members may also withdraw any part of the payments on their stock on the same terms."

In the instant case our statute requires a 30-day notice, but permits the board of directors to withhold one-half of the incoming funds for other purposes, and, therefore, as in the Fredrick Case, the maturity of the obligation to the withdrawing stockholder is necessarily suspended, not only for the 30 days, but for a greater period of time, as much in the judgment of the board of directors as in the Frederick Case, because the statute leaves the matter for the determination, in Oklahoma, of the board of directors. It might pay out the full amount of monthly receipts and not take advantage of the statutory provisions.

In the case at bar the board of directors saw fit in their discretion to suspend the stockholder's right to receive money until his application reached its proper place in numerical order and until funds were available from one-half of the company's monthly receipts.

Whatever may be the status of the law elsewhere, it is evident that there is great conflict on the question, and we believe the better rule to be the one adopted in this opinion.

It is unnecessary to go further in a discussion of the authorities cited as they either bear out our conclusions by implication, or turn on other issues.

2. On the next proposition which is raised by this appeal, as to the validity of the Bank Commissioner's so-called 75%-25%

order, we conclude that the Bank Commissioner of the state of Oklahoma, either with or without the approval of the Building and Loan Board, has no power or authority to issue or to enforce in the case of an admittedly solvent and going building and loan association, an order such as was issued in this case, ordering or directing the Building & Loan Associaiton in the case of withdrawing stockholders to pay them on withdrawal only 75 per cent. of the value of the stock to be withdrawn and to withhold 25 per cent. of the stock for protection against possible losses due to a depression of values or for any other reason, prior to the adoption of the amendment to section 9800, Okla. Stats. 1931, effective May 5, 1933, and such an order made after the adoption of such statute would not be effective as to those stockholders who had served notice of withdrawal prior to the adoption of such amendment. Particularly is this true where the order relates only to withdrawing shareholders and not to borrowing shareholders. The validity of this order would not in any wise be affected by, nor would the Bank Commissioner be authorized because of, the existence of depressed financial conditions throughout the country, as shown in the Bank Commissioner's order, and the mere existence of extraordinary or unusual economic and financial conditions throughout the country, resulting in unusual demands for withdrawal, and in depression of values, in no wise vested in the Bank Commissioner and the Building and Loan Board powers which are not granted to them by the statutes of the state.

We conclude that the defendant Building & Loan Association was therefore not justified in withholding 25 per cent. of the moneys due to withdrawing stockholders, and that its obligation was to pay to withdrawing stockholders the moneys due them in accordance with section 9800, Okla. Stats. 1931, in the order in which their notices of intention to withdraw were filed; provided, of course, that the loan company was not obligated to use more than one-half of the funds in the treasury of the corporation or received in any one month in satisfying these withdrawals.

Our reasons for reaching this conclusion are as follows:

Unquestionably the Building and Loan Board and the Bank Commissioner cannot change the statutory or contractual rights of the stockholders of a building and loan

association, unless they are specifically granted the power to do so by the statutes of the state of Oklahoma. Section 9800, Okla. Stats. 1931, specifies the rights of a withdrawing stockholder. The by-laws of the loan company likewise specified his rights at the time of the service of his notice of intention to withdraw. Unless some other section of the statutes grants the power to the Bank Commissioner and Building and Loan Board to suspend the operation of the statutes and by-laws of the loan company, there could be no variation from the terms of his contract, the provisions of the statutes and the by-laws. In order that we may ascertain the power of the Bank Commissioner and the Building and Loan Board, we have examined the statutes concerning these matters, commencing with section 9846, Okla. Stats. 1931, to and including section 9869, the concluding section of the entire chapter on the government of building and loan associations, and in such sections of the statutes we find no authority either by implication or direct provision granting to the Bank Commissioner or the Building and Loan Board any power to suspend the contract, the statutes or the by-laws of a solvent and going building and loan association in relation to withdrawing stockholders.

It is notable that the Bank Commissioner's order related only to withdrawing shareholders and maturing stock and not to borrowing stockholders. Even if the 75%-25% order were a valid order and within the jurisdiction of the Bank Commissioner and Building and Loan Board, it would thus result in a discrimination against the withdrawing stockholders and those having fully paid and matured stock in favor of borrowing stockholders, requiring those who had not borrowed from the company and who were withdrawing fully paid or matured shares of stock to stand losses or the possibility of losses, while borrowing members are not required to suffer any loss. An order thus made would be discriminatory and void. Even if the Bank Commissioner and board had authority to make such an order, they would be required to make it applicable alike to all stockholders, and enforcement of the same against one class of stockholders and exemption of other stockholders from the force of the order would render it void and unenforceable. This class of discriminatory administrative orders by governmental boards has often been stricken down for unlawful discrimination by the Supreme Court of the United States and other courts of the nation. It is unnecessary, however, to cite these many cases in this connection, since we believe the Bank Commissioner and Building and Loan Board to be without authority to make the order, whether applicable to all the stockholders or not.

The adoption of the 1933 Statutes, if permitted to be effective as to those who had already served notices of their intention to withdraw, would amount to an impairment of the obligations of their contracts, and would have in general the effect of ex post facto laws. The right of the withdrawing stockholder is to be determined by the status of the law, the nature of his contract and by-laws of the corporation as they existed on the date of the service of his notice of intention to withdraw.

3. The record is unsatisfactory as to the date on which the plaintiff would have been entitled to receive payment of the amount due him on withdrawal of his stock, except that Mr. McWilliams admitted on cross-examination that on the date on which suit was filed by D. M. Smith, to wit, August 21, 1933, the loan company would have had sufficient money on hand to pay his demand in full, if the 75%-25% order had not been obeyed. The result of the 75%-25% order was to permit the building and loan association to pay subsequently withdrawing stockholders portions of their demands before the payment to plaintiff of his remaining 25 per cent.

We therefore conclude that, on August 21, 1933, if not before, D. M. Smith should have been paid in full the amount of his demand. Upon the maturity of a liquidated demand in the state of Oklahoma, the person holding the demand is entitled to receive 6 per cent. interest on the amount of his demand.

We therefore conclude that the trial court should have entered judgment on the trial of this cause in favor of D. M. Smith for the 25 per cent. of his stock which had been improperly withheld from him by the association, with interest thereon at the rate of 6 per cent. per annum from the 21st day of August, 1933, and that the trial court should have entered a further judgment in favor of D. M. Smith for his proportionate share of all of the dividends which had been declared on the stock of the association subsequent to the date on which his demand was made and prior to the date on which his demand matured, and should have been paid, and for all costs of the action.

The judgment of the trial court is reversed, and the cause remanded, with directions to enter judgment in accordance with the views and holdings herein expressed.

The Supreme Court acknowledges the aid of Attorneys A. K. Swann, B. A. Hamilton, and F. V. Westhafer in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Swann and approved by Mr. Hamilton and Mr. Westhafer, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration, this opinion was adopted.

McNEILL, C. J., OSBORN, V. C. J., and RILEY, BAYLESS, CORN, and GIBSON, JJ., concur. WELCH, J., concurs in the result. BUSBY and PHELPS, JJ., absent.